# KOPPEL *v.* DOWNING.

### COPYRIGHT.

1. Where the proprietor of a manuscript translation of a play licenses a theatre manager to use the translation for a specific purpose, the licensee can not confer upon a printer and publisher of the play the power to copyright it, and a copyright so attempted to be taken out is invalid.
2. Nor can the proprietor of the manuscript, in such a case, in a suit brought by the printer and publisher against one whom he claims to be infringing his alleged copyright, by adoption constitute the plaintiff a trustee for himself upon an agreement to share the recovery with him. The policy of the law is against such disguises and they will not be encouraged by the courts.
3. Where the owner of a manuscript, after filing with the Librarian of Congress copies of the title page, neglects to perfect his copyright by filing copies of the published work as required by law, and by such neglect abandons his right, that right can not, sixteen years afterwards, be revived by authorizing somebody else to apply for and obtain a copyright in a name different from that of the real proprietor.

No. 638. Submitted February 12, 1897. Decided May 25, 1897.

HEARING on an appeal by the plaintiff from a judgment on a verdict directed by the court in an action to recover penalties for the alleged infringement of a copyright. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Charles C. Lancaster* and *Mr. Jackson H. Ralston* for the appellant:

1. Section 4952, Rev. Stats., does not define the amount of interest a party should have to constitute him the proprietor of a dramatic composition, and, therefore, any substantial interest is sufficient to give the owner of a copyright the legal title to the same against all parties having, or claiming,

no interest or ownership in the original composition. *Hanson* v. *Jewelry Co.*, 32 Fed. Rep. 202.

2. It will depend on the terms of the agreement between the publisher and the author whether the latter has a copyright in his work, or whether such copyright belongs to the former. Where there is an express agreement, the terms of the agreement determine the fact; and where there is no express agreement, the intention of the parties may be determined by the attending circumstances. *Little* v. *Gould*, 2 Blatch. 165; *Boucicault* v. *Fox*, 5 Blatch. 87; *Lawrence* v. *Dana*, 4 Cliff. (U. S.) 1. Not only was there an express agreement in this case, but all the attending circumstances show the intention of Pope, Palmer, and the appellant to constitute the latter the proprietor of the dramatic composition when he took out the copyright.

3. When the proprietor of a copyright relies upon a legal title he is bound to set it forth, and it must appear to be at least *prima facie* valid. But it has also been held that there are cases in which an equitable title is sufficient to entitle its possessor to protection in this form. *Little* v. *Gould*, 2 Blatch. 181; *Pulte* v. *Derby*, 5 McLean (U. S.), 328.

When it appears that the copyright has been secured in the manner prescribed by the statute, and that it is the property of the plaintiff, a *prina facie* case is made out, and the burden is on the defendant to show that the copyright is invalid, or the plaintiff's title defective. Drone on Copyright, 499. "*Prima facie*," says Mr. Justice Story, "the copyright confers title; and the onus is on the other side to show clearly that, notwithstanding the copyright, there is an intrinsic defect in the title." 2 Story Eq. Jur., Sec. 936, note 6.

Pope, by authorizing the dramatic composition to be copyrighted as it was, is estopped from denying that Koppel is the proprietor within the meaning of the copyright law, if he should so desire. But, on the contrary, he admits the proprietorship of the copyright in Koppel. No one else has

shown any interest sufficient to contest Koppel's right, as established by the Librarian of Congress. No proof whatever was given by the appellee denying the allegations of the declaration or to contradict the proof introduced by the appellant. The facts as proven are therefore admitted.

4. It is admitted by appellee that he performed for a consideration the play of "Samson," as copyrighted by the appellant, thirty-three times in various theaters in the United States without the consent of the proprietor thereof. The appellant was therefore entitled to judgment for the damages provided in Sec. 4966, R. S. *Boucicault* v. *Fox,* 5 Blatch. 87.

There the action was for the violation of the copyright of a play called the "Octoroon," by performing said play nine times, and a verdict was rendered for the plaintiff for damages, as provided by the statute.

*Mr. James S. Edwards* and *Mr. Job Barnard* for the appellee:

1. If the plaintiff is the proprietor of this copyright as claimed, then the contract made between him and Pope, whereby Pope was to employ counsel, pay all costs and have two-thirds of the amount of recovery, is a champertous contract and void. *Johnson* v. *Van Wyck,* 4 App. D. C. 294. Champerty is defined to be a species of maintenance, being a bargain with a plaintiff to divide the land or other matter being sued for between them if they prevail at law, whereupon the champertor is to carry on the suit at his own expense. *Manning* v. *Sprague,* 148 Mass. 20.

2. As matter of fact, Koppel has no right to maintain this suit, because he does not come within the class of persons authorized by the statute (Sec. 4952) to have a copyright, and thus to have the "sole liberty of publicly performing or representing" the dramatic composition. He is not, and was not at the time he filed the title page and copies, either the author or proprietor of said dramatic composition, or the executor, administrator or assignee of any such person.

Mr. Palmer, who was a mere licensee, had no right to take out a copyright, much less to authorize a stranger to do so in his own name.

A " proprietor " is one who has acquired the *exclusive* right of some native author. *Yuengling* v. *Schile,* 20 Blatchf. 452, 461. Koppel never bought this composition or translation ; it was never assigned to him ; it was not a donation to him. He only had a contract with Palmer to print it, for which he was fully paid.   He never claimed any right to control its performance by anybody, and never performed it himself, and the law certainly does not contemplate that the defendant shall be liable to pay him damages for an infringement of a right he never possessed.

3. In this case, Pope had failed to perfect his copyright, and had given Palmer license to use and print the play ; and Koppel having no proprietorship in the play itself, could not legally copyright it as his own; it therefore follows, that his publication and distribution of the same all over the country, has the effect of making this play public property, and the right to copyright is lost.   *Clemens* v. *Belford,* 14 Fed. R. 728; Drone on Copyrights, 577, 616. The failure to make publication and to file the two copies required, within a reasonable time after filing the title page, operates as an abandonment, and loses the author or proprietor the right to copyright.   *Boucicault* v. *Hart,* 13 Blatch. 47, 54.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The plaintiff, Charles D. Koppel, the present appellant, brought this action against the defendant, Robert Downing, to recover the penalties prescribed for the alleged infringement of a copyright, the copyright being alleged in the declaration to belong to the plaintiff as proprietor.   The subject of the alleged copyright is the translation of a certain dramatic composition known as "Samson," the original of

which in Italian was the work of Ippolito D'Aste, and which has been translated into English by W. D. Howells. It is alleged that the defendant, without license, publicly performed the play thirty-six times, under the title of "Samson and Delilah," and thus infringed the plaintiff's copyright.

The defendant pleaded the general issue, not guilty, under which plea all matters of defense were admissible. Rev. Stat. U. S., Sec. 4969. The case was tried before a jury, and resulted in a verdict for the defendant. The verdict was returned under the instruction of the court, and that instruction forms the subject of the only exception taken in the case, and the ruling thus excepted to is the only error assigned.

The court, below in quite an extended and very clear opinion, passed upon several questions supposed to be involved in the instruction given (24 Wash. Law Rep. 342); but we do not deem it necessary to review all the questions that were considered and decided by the learned justice below. The first and principal question is, whether the plaintiff had such proprietary right and interest in the manuscript of the translation of the dramatic composition known as "Samson," as to entitle him to acquire copyright therein, under the statute, and the consequent right to maintain this action for an infringement of that right.

There are several sections of the Revised Statutes of the United States that have relation to the question here presented, and which are as follows:

"Sec. 4952. The author, inventor, designer, or *proprietor* of any book, map, chart, dramatic or musical composition, etc., and the executors, administrators, or *assigns of any such person,* shall, upon complying with the provisions of this chapter, have the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and vending the same; and, in the case of a dramatic composition, of publicly performing or representing it, or causing it to be performed or represented by others. . . .

"Sec. 4955.   Copyrights shall be assignable in law by any instrument of writing, and such assignment shall be recorded in the office of the Librarian of Congress within sixty days after its execution; in default of which it shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice.

"Sec. 4956.   No person shall be entitled to a copyright unless he shall, on or before the day of publication, in this or any foreign country, deliver at the office of the Librarian of Congress, or deposit in the mail within the United States, addressed to the Librarian of Congress, at Washington, a printed copy of the title of the book, map, chart, dramatic or musical composition, engraving, cut, print, etc., for which he desires a copyright, nor unless he shall also, *not later than the day of the publication thereof,* in this or any foreign country, deliver at the office of the Librarian of Congress, at Washington, or deposit in the mail within the United States, addressed to the Librarian of Congress, etc., *two copies of such copyright book,* map, chart, *dramatic* or musical composition, etc.:   .   .   .   *Provided, nevertheless,* that in the case of books in foreign languages, of which only *translations in English are copyrighted, the prohibition of importation shall apply only to the translations of the same,* and the importation of the books in the original language shall be permitted.

"Sec: 4966.   ·Any person publicly performing or representing any dramatic composition for which a copyright has been obtained, without the consent of the proprietor thereof, or his heirs or assigns, shall be liable for damages therefor, such damages in all cases to be assessed at such sum, *not less* than one hundred dollars for the first, and fifty dollars for every subsequent performance, as to the court shall appear to be just."

It is for the penalties or measure of damages prescribed under this last section that this action is brought.

It is shown in proof, and about which there is no dispute, that a Mr. Pope, a theatrical manager, employed W.

D. Howells, in 1874, to translate for him the Italian tragedy, entitled "Samson," by D'Aste. Pope, on obtaining the translation, played it in St. Louis and other places without printing it. He also undertook to copyright this translation in his own name, and, for that purpose, he filed a title page with the Librarian of Congress in 1874. It appears, according to his own testimony, that he had supposed that he had effected such copyright, but it turned out some twenty years afterwards, upon making demand of the defendant for compensation for alleged infringement, that no copies of the translation of the tragedy had ever been filed with the Librarian, as required by the statute, and consequently no copyright had ever been acquired by Pope. But in 1889, Pope gave A. M. Palmer, a theatre manager of New York, license to use the translation of "Samson," during the artistic tour of Salvini in this country, and Palmer employed the plaintiff to print the play, the latter having nothing whatever to do with the performance of it. According to the arrangement made, Pope was to receive ten per cent. on sales of librettos made by Palmer, but it seems the terms of the arrangement were never observed, and Pope entirely neglected the matter, until his attention was called to it in December, 1893, by an interview published in a newspaper, when he wrote to the defendant upon the subject, claiming the copyright. Finding that he had no ground for such claim, he applied to Palmer, and learned from him that the plaintiff had printed the play and had obtained a copyright therefor in his own name. This led to an interview between Pope and the plaintiff, and, it seems, that they came to an understanding in regard to proceedings against the defendant, whereby it was agreed that Pope should employ counsel, pay costs of suit, and prosecute the defendant in the plaintiff's name—the latter to receive one-third of the damages that might be recovered, and Pope the other two-thirds. Both the plaintiff and Pope testified as witnesses in the case; Palmer did not testify.

The plaintiff testified to his making application for and obtaining certificate of copyright of "Samson, a tragedy in five acts, by Ippolito D'Aste, translated by W. D. Howells, with English and Italian words, as performed by Signor Salvini," of which the plaintiff claimed to be proprietor. He then proceeds to say: "The manuscript was delivered to me by Mr. A. M. Palmer, theatrical manager and owner of Palmer's Theatre, New York City, with instructions to publish and copyright the same for the benefit of all persons concerned. Col. Pope owned this manuscript at the time I published it. I am not proprietor of this manuscript, and it is not in my hands or under my control. I paid no money for the manuscript except the expense of publishing it. Mr. Palmer got the profit on the publication; Mr. Palmer paid me for printing it. I published it under a contract with Mr. Palmer, who was to pay me, by check or any other usual method, a certain amount per thousand for the printing of these librettos. All I had invested in the matter was the cost of printers' work and printing. I knew nothing about Mr. Palmer's title to this work, and I had never seen Mr. Pope at the time I published this play.

"I would be hurt by the playing of this dramatic composition by the defendant, because I delivered the copies to Mr. Palmer, who sold them at his different theatres, and his playing and selling the librettos would be hurt. I understood that I was to do all the printing; I simply followed and obeyed Mr. Palmer's orders in copyrighting and in printing. I did not know of my own knowledge anything about the infringement by the defendant, but was informed thereof by Mr. Pope. I did not communicate at all with Mr. Downing. Mr. Pope employed counsel, who brought the suit. I have a money interest in this suit; don't know exactly how much; a certain proportion of the recovery—one-third. I have not paid any part of the expenses of suit; such expenses have been paid by Mr. Pope. The Italian version of this play was handed me at the same time as the

translation, and they were published in one book. I understood that the Italian had been published in this country many years before. The copyright sued on here was taken out by me at the request and injunction of Mr. Palmer, who agreed with me that I was to do all the printing, and nobody else, at a certain price, and I got my pay for all I printed. Mr. Pope had the interest in the dramatic performance of this play."

He further says : " I went to a very considerable expense in having these librettos printed, and, as I remember, expended the sum of eight hundred dollars. I understood that I was the proprietor of the manuscript, having a special interest in it for the purpose of publication."

Mr. Pope, as a witness, said : " I have been a theatrical manager and an actor and have been the owner of a theatre in St. Louis. Signor Salvini, as a courtesy to me, furnished me with a copy of the Italian version of the tragedy called ' Samson,' giving me permission to have it translated into the English language. In the year 1874 I employed W. D. Howells to translate this play into English, paying him for the work of translation $1,000. The work was in manuscript and never published. I performed the play called ' Samson' in the city of St. Louis, in 1874, and at various other cities and at various other times in the United States and Canada. In the spring of 1889, at the request of Mr. A. M. Palmer, lessee and manager of Palmer's Theatre, New York City, I furnished him with the manuscript translation of 'Samson' by W. D. Howells, with the instruction that it should not be played unless copyrighted, and that he, Palmer, should have it copyrighted, and this Palmer agreed to do. I lost trace of the play after placing it in Mr Palmer's hands. I was to receive a certain percentage on the sale of all librettos. I should not have furnished the play for printing except for the distinct understanding that it should be copyrighted. The first I heard of the copyright being infringed was in the fall of 1893, when I was in-

formed that this play was being produced in St. Louis by
Robert Downing and a troupe." The witness wrote to
Downing upon the subject, and the latter replied denying
witness' right to the play. The witness further testified:
"I had learned before placing the play in Mr. Palmer's
hands that the copyright which I supposed I had taken out
in 1874 by filing the title page with Librarian had failed
for want of filing copies. I gave the privilege to Mr.
Palmer of having the play produced by Salvini in this
country with the absolute understanding that it should be
copyrighted if he should publish it. I did not know Mr.
Koppel, and only made his acquaintance after I discovered
that Downing was playing the tragedy. I insisted on Mr.
Palmer having the play copyrighted, when I was still
under the impression that I had a good copyright, and had
a proprietary right in my play. I had parted with it only
temporarily to Palmer, and thought I had ownership in it.
I had not seen the libretto and did not know that Palmer
had complied with my request to have the play copyrighted
until I made inquiry. I only made the assignment to Pal-
mer specifically for the Salvini production." He then
says: "I employed counsel and brought this suit. I expect
to receive several thousand dollars as my share in the re-
covery. There is a division of the matter between Mr.
Koppel and myself. He is to receive about one-third; not
less than that, at any rate."

It was shown in proof, and admitted on the part of the
defendant, that the latter had acted the play thirty-three
times for admission fees.

It was upon this state of the case, as shown by the plain-
tiff, that the court instructed the jury to find for the defend-
ant.

It is manifest according to well defined meaning of terms,
that the plaintiff at the time he applied for and obtained a
registry of copyright of the play, in his own name, was neither
the author nor proprietor of the dramatic composition called

" Samson," or of the translation thereof, and had not "the sole liberty of printing, reprinting, representing, publishing, copying and vending the same, or of publicly performing or representing it, or causing it to be performed or represented by others." Indeed, he had no proprietary right or interest in it at all. The statute here involved must be construed as other statutes are construed, and the terms employed to describe persons entitled to the benefit of the statute must be allowed their ordinary and well defined meaning. The term " proprietor" has a well defined meaning, and, according to lexicographers, its meaning is " one who has the legal right or exclusive title to anything, whether in possession or not; an owner; as the proprietor of a farm or mill." Webster Dict. And Worcester defines the term " proprietor" as meaning "a possessor in his own right; an owner; a proprietary." Worcester Dict. It is certainly clear that Palmer, as a mere temporary licensee in the use of the manuscript of the play (he was not an assignee of it), without special authority from the proprietor to act as his agent, had no right to take out a copyright of the translation of the original work, and of course, no authority to confer upon a stranger the right to do so in his own name. It is true, there are many cases in the books where authors and proprietors of manuscripts have authorized publishers and printers to apply for and obtain copyright in their own names; but those cases are founded upon express contracts and in privity with the author or proprietor of the manuscript; not cases where the party obtaining the copyright in his own name was an entire stranger and wholly unknown to the real proprietor, and without any proprietary interest whatever in the manuscript. According to the testimony of Pope, he did not intend when he loaned the manuscript to Palmer for mere temporary purpose, to part with it or divest himself of his proprietary right in the manuscript. He says that he supposed at the time that he had a perfected copyright in himself, and he so informs the defendant in

his letter of December 26, 1893, in which he claims the copyright to be in himself. Whatever understanding he may have had with Palmer, in respect to having the play copyrighted, he could not have intended to have the play subject to a double copyright, one in himself, and another under a different claim, and in the name of a stranger in whom existed no sort of proprietary right. The interest of the plaintiff was not that of proprietor of the manuscript, but that of a printer or publisher only. He was not entitled, therefore, to obtain a copyright under the statute to protect that interest only. It would be in plain contravention of the meaning and policy of the statute to maintain the validity of a copyright obtained for such purpose, and under the circumstances that the present was obtained. It is true, the real proprietor of the manuscript has attempted, by a retroactive adoption, to constitute the plaintiff a kind of trustee; but that was only an expedient resorted to for the purposes of this suit, brought to recover penalties supposed to have been incurred for infringement of the copyright. The litigation, while in the name of the party obtaining the copyright, without proprietary interest, is really carried on by and at the expense of the proprietor, and for his benefit. The policy of the law is against such disguises, and they should not be encouraged by the courts. The law of copyright, while securing a long continued monopoly, contemplates, and the policy of it requires that the public should have notice, by a true and correct official registry, as to the real author or proprietor entitled to the enjoyment of such monopoly as against the public. The courts should not encourage or support false claims to title to copyright.

But there is another ground for holding that the plaintiff did not acquire a valid title to the alleged copyright; and that is, that the title to such copyright had been abandoned by Pope, under whom the plaintiff claims, if he has any claim at all.

It is not pretended that the right of the manuscript was ever assigned to the plaintiff for consideration, without notice, or that such right was ever donated to him. All that he claims is that he only had a contract with Palmer to print the manuscript, for which he was fully paid. He never claimed any right to control the performance of the play by anybody, and never performed it himself. He therefore could claim to stand in no better position nor to occupy any higher ground, in a legal sense, than the proprietor, Pope, himself. And if Pope had failed and neglected to perfect his copyright as originally claimed, and by such failure and neglect abandoned such right, that right could not be revived by authorizing somebody else to apply for and obtain a copyright in a name different from that of the real proprietor, sixteen years after the filing of the title page by the proprietor himself, under Section 4956, R. S. U. S.

This principle, and construction of the statute, was strongly enforced in an opinion by the late Mr. Justice Hunt, in the case of *Boucicault* v. *Hart*, 13 Blatchf. 47, 54, referred to and quoted from in the opinion of the court below. In that case the plaintiff had filed the title page of his work, but had not followed it up by depositing the two printed copies as required by the statute. A bill was filed for an injunction, and the plaintiff claimed that the copyright was sufficiently perfected by filing the title page only, to entitle him to relief. But the learned justice said:

"The author shall not be entitled to a copyright unless, within ten days from the publication, he shall deliver two copies to the Librarian. It is not a fair interpretation of this section to hold that the filing of the title page entitles him to a copyright fully and absolutely, and that this may be defeated by a publication and failure to deliver two copies, but as long as there is no publication, although it continue indefinitely, there is no lapse of the right. This construction is not permitted either by the idea which secures bene-

fits to the author or inventor, upon the theory that the public is to be benefited, as well as himself, by his works, or by the principle pervading all this branch of the law of patents, trademarks and copyrights; that an author or inventor must put his claim in the form of a well defined specification, work or composition, and so place it on record, so that he cannot alter it to suit his circumstances, and so that other authors and inventors may know precisely what it is that has been written or invented." And continuing, the learned justice said: "The principle I conceive to be the same in regard to a copyright, and I hold that, to secure a copyright of a book or dramatic composition, *the work must be published within a reasonable time after the filing of the title page, and two copies be delivered to the Librarian.* These two acts are, by the statute, made necessary to be performed and we can no more take it upon ourselves to say that the latter is not an indispensable requisite to a copyright, than we can say it of the former." See, also Dròne on Copyright, page 615.

If by neglect and long delay (now more than twenty years) Pope had lost the right to follow up and complete his title to copyright, initiated in 1874, it would be wholly inadmissible to allow him now to secure the benefit of that which he has abandoned, by adopting, for a special object, the copyright granted to another person without his authority. It is clear, we think, that there is no ground for the present action, and that the judgment of the court below must be affirmed; and it is so ordered.

*Judgment affirmed.*